UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRYAN C. POWERS,

                          Plaintiff,

        v.

WASHINGTON DEPARTMENT OF
CORRECTIONS, ELDON VAIL,
RONALD FRAKER, BRENT CARNEY,
JAY A. JACKSON, JAMIE CALLEY,

                          Defendants.

No. C11-5806 RBL/KLS

**REPORT AND RECOMMENDATION
NOTED FOR:  April 19, 2013**

        Before the Court is the Motion for Summary Judgment of Defendants Eldon Vail, Ronald
Fraker, Brent Carney, Jay Jackson, Jamie Calley, and the Washington Department of Corrections
(DOC).  ECF No. 26.  Defendants served Plaintiff with a *Pro Se* Prisoner Dispositive Motion
Notice consistent with *Woods v. Carey,* 684 F.3d 934, 935, 940-41 (9th Cir. 2012) and in
accordance with the holding of *Rand v. Rowland,* 154 F.3d 952, 962-63 (9th Cir. 1998).  ECF
No. 27.  Plaintiff Bryan C. Powers filed a brief in opposition (ECF No. 35), a Declaration (ECF
No. 36), and a Statement of Disputed Factual Issues (ECF No. 37).  Defendants filed a reply and
motion to strike.  ECF No. 38.

        Mr. Powers, a pro se prisoner who is currently incarcerated at the Washington State
Penitentiary (WSP), alleged in his complaint that in 2010, when he was incarcerated at the
Clallam Bay Corrections Center (CBCC), Defendants implemented Ramadan food service
policies that violated his rights under the First Amendment (Freedom of Religion), Eighth

REPORT AND RECOMMENDATION  - 1

Amendment (cruel and unusual punishment), Fourteenth Amendment (due process and equal protection), and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA").  ECF No. 7.[1]  Having reviewed the motions, supporting declarations, and balance of the record, the Court recommends that Defendants' motion for summary judgment (ECF No. 26) be granted.

## MOTION TO STRIKE

Defendants move to strike Mr. Powers' declaration, exhibits, and declarations of other inmates (ECF No. 36), in their entirety on the grounds of relevance because the Defendants do not contest that Mr. Powers sincerely held religious beliefs require him to observe Ramadan. ECF No. 38, p. 2.  Mr. Powers may testify to his religious beliefs and observances as these are relevant to the issue of whether Defendants substantially burdened those beliefs and observances. Thus, Defendants' motion to strike on this ground is denied.

Defendants also object to the following specific paragraphs in Mr. Powers' declaration (ECF No. 36):

1)       ¶ 11 – (Statements made to and by Chaplain Duncan).  Chaplain Duncan's statements are hearsay because they are out of court statements presented for the truth of the matter asserted.  However, the Court will consider the information contained in this paragraph as evidence that Mr. Powers and Mr. Carter met with the chaplain to discuss the new policy.

2)       ¶¶ 14, 15, 18 – (Actions by Mr. Whitman).  In these paragraphs, Mr. Powers relates actions taken by Mr. Whitman, *i.e.,* receiving nutritional fact labels from the 2010 Ramadan box meals and a Nutrient Analysis Report that Mr. Whitman received in his state court

---

[1] Similar claims filed by other inmates relating to the 2010 Ramadan meals are pending in this Court.  *Daniel C. Carter v. DOC, et al.,* C11-5626 RJB/KLS; *Tony Smith v. DOC, et al,* C11-5731 BHS/JRC; *Harry J. Whitman v. DOC, et al.,* C11-5457BHS; *Marco Garnica v. DOC, et al.,* C12-5544 RJB/KLS.

REPORT AND RECOMMENDATION  - 2

case.  Defendants argue that no foundation has been laid to establish Mr. Powers' personal

knowledge.  ECF No. 38, p. 2.  Mr. Powers cannot testify as to the filings in another inmate's

lawsuit.  However, he may testify as to what nutritional information he himself read from the

sides of meals that were served to him during Ramadan.  Similarly, Mr. Powers can testify to the

nature of the meals that he was served and may offer his own opinion as to what he felt was

lacking from the meals.  Mr. Powers is not an expert in nutrition and therefore, may not assert an

expert opinion as to whether the meals served were, in fact, nutritional or that by serving the

meals, Defendants violated his Eighth Amendment rights.

Defendants also move to strike ¶ 7 of the Declaration of Daniel C. Carter (ECF No. 37,

pp. 67-68), on the grounds that Mr. Carter does not have the expertise to given an opinion on the

nutritional value of the foods served during Ramadan.  ECF No. 38, p. 2.  In paragraph 2, Mr.

Carter states that he can confirm that in addition to the "insufficient boxed meals," a sack was

provided containing various food items.  Mr. Carter attributes a caloric value to each item and

states that the sack contained mostly sugar, starch, and condiments.  ECF No. 37, p. 68.  Mr.

Carter may testify as to what nutritional information he himself read from the sides of meals that

were served to him during Ramadan, the nature of the meals served to him, and what he felt was

lacking from the meals.  However, as Mr. Carter is not an expert in nutrition, he may not offer an

expert opinion as to whether the meals served were, in fact, nutritional or that by serving the

meals, Defendants violated his Eighth Amendment rights.

Defendants move to strike an unsigned declaration of Daniel Carter (ECF No. 37, pp. 69-

73) dated October 23, 2010, which appears to have been prepared but not filed in Thurston

County Case No. 10-2-01754-0, an action for preliminary injunction filed by Inmate Harry

Whitman.   The declaration is unsigned and not attested to under penalty of perjury.  It is

REPORT AND RECOMMENDATION  - 3

therefore not competent evidence nor is the declaration relevant to the issues before this Court. Therefore, this declaration will not be considered.

## FACTS

Bryan C. Powers is a Muslim inmate who has been incarcerated for approximately 19 years.  He states that it is a mandatory obligation of his religion that he fast for thirty days during the Islamic month of Ramadan.  ECF No. 36, Declaration of Bryan C. Powers, p. 1, ¶ 2.  Mr. Powers states that he has participated in approximately 19 Ramadan fasts while incarcerated and that prior to Ramadan 2010, he was served two sack meals and one hot meal during Ramadan. He claims that these meals allowed him to maintain his normal weight during Ramadan.  *Id.*, pp. 1-2, ¶ 4.

Mr. Powers states that on August 9, 2010, the day before the 2010 Ramadan fast began, he weighed 164 pounds.  ECF No. 36 (Powers Decl.), p. 9, ¶ 26.  Inmate Carter states that he was with Mr. Powers at the gym on that day and can confirm that Mr. Powers weighed 164 pounds. ECF No. 37, Exhibit 2, Declaration of Daniel C. Carter, p. 67, ¶ 3.  Mr. Powers states that by the end of 2010 Ramadan, he weighed 149 pounds, a total of 15 pounds less than when the fast began.  ECF No. 36 (Powers Decl.), p. 9, ¶ 26.  A medical note attached to Mr. Powers' complaint indicates that on September 8, 2010, Mr. Powers weighed 149 pounds.  ECF No. 7-1, p. 47.

Jay Jackson is Food Service Program Manager for the DOC.  According to Mr. Jackson, prior to 2010, Ramadan meals consisted of a dinner hot meal and sack meals equaling breakfast and lunch calories.  ECF No. 26-1, Exhibit 1 (Declaration of Jay Jackson), p. 2, ¶¶ 1, 3.  The Ramadan dinner hot meal would typically be served after mainline (the standard meals served to the general offender population at a correctional facility).  Serving the Ramadan hot dinner meal

REPORT AND RECOMMENDATION  - 4

so that Ramadan participants received their meals after sunset incurred additional food service and custody staff time. *Id.*, ¶ 3. Some facilities would store the warm portion of the meal in a heated unit to maintain temperature, while other facilities provided an extra mainline, thereby occurring additional staff costs, including overtime. *Id.*, p. 3, ¶ 4. Mr. Jackson states that there is no nutritional difference between a cold meal and a hot meal. *Id.*, ¶ 5 n.2.

Brent Carney is the Dietary Services Manger of DOC. He is a certified dietitian in the state of Washington and obtained registered dietitian credentials from the Academy of Nutrition and Dietetics. ECF No. 26-1, Exhibit 2 (Declaration of Brent Carney), p. 18, ¶ 1. Mr. Carney states that in 2009, DOC looked into providing Ramadan box meals for offenders who would be celebrating Ramadan in 2010 (which would occur August 11, 2010 through September 9, 2010). *Id.*, p.19, ¶ 6. According to Mr. Carney, providing a Ramadan box meal that contained food items for a full set of meals eliminated any need for additional food service staffing and meal preparation outside of normal working hours, additional meal deliveries to segregation units, additional custody staff, and other additional operational overhead. Overall, box meals would reduce costs and minimize the disruption to kitchen staff while allowing offenders to meet their nutritional needs. *Id.*

The use of box meals anticipated the issue of Ramadan moving towards the summer solstice. ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 3, ¶ 6. Every year the beginning of Ramadan moves forward roughly ten days. This creates an ever-increasing time period between mainline dinner and when the Ramadan hot meal would be served after sunset. This trend increases the burden on the DOC by extending the time it needs to have personnel available to staff the dining hall after-hours during Ramadan. Additionally this has the potential to interfere with prison operations as many correctional program opportunities occur after mainline. *Id*.

REPORT AND RECOMMENDATION  - 5

Mr. Jackson states that standardized box meals addressed offenders' complaints that Ramadan meals were different depending on where the offenders were housed.  ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 3, ¶ 7.  Furthermore, because the box meal was cold, offenders would have greater flexibility on when they could consume their meal.  Offenders could pick-up their box meals and take them back to either their cell or chapel to break their fast.  Unlike the hot portions of meals that had to be eaten shortly after they were served, the cold meal could be consumed anytime during the evening.  *Id.*

On October 28, 2009, Jay Jackson and Brent Carney attended a Food Managers Meeting at the Airway Heights Corrections Center to discuss the plan to introduce Ramadan box meals for 2010.  It was planned that at the next meeting the possible food items that were to be included in the Ramadan box meals would be discussed.  ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 3, ¶ 8; ECF No. 26-1, Exhibit 2 (Carney Decl.), p. 20, ¶ 7.

On March 9, 2010 and March 10, 2010, another meeting was held to discuss the proposed food items that would be included in the Ramadan box meals.  It was decided that two different boxes would be offered every other day.  The boxes would contain such items as cereal and powdered milk, fresh or dried fruit, breakfast coffee cake item, peanut butter and bread, Halal lunch meat with cheese, bread, condiments, dried dates to break the fast, and two fortified fruit drinks.  ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 4, ¶ 9; ECF No. 26-1, Exhibit 2 (Carney Decl.), p. 20, ¶ 8.  The food items for the box meals were selected using available Halal supplies, items not easily spoiled, and items not needing to be heated when the kitchens are closed and/or held in food warmers beyond the recommended storage guidelines.  *See* ECF No. 26-1, Exhibit 2 (Carney Decl.), pp. 19-20, ¶ 6.

REPORT AND RECOMMENDATION - 6

On March 11, 2010, Defendant Carney sent a rough draft of Ramadan nutritionals to Correctional Industries (CI) for input and review. ECF No. 26-1, Exhibit 2 (Carney Decl.), p. 20, ¶ 9. CI uses the Esha program for nutritional analysis of the foods it produces for the DOC. CI staff enter the nutritional data of CI foods into the Esha software by inputting the food product, recipe, and portion size to get the nutritional values for each item. *Id.*, p. 19, ¶ 4. DOC also uses software purchased through CI to perform nutritional analysis for menus. DOC staff enters the nutritional data into the CI software. The data entered into the CI software consists of recipes, products, and portion size for menu items. The final product is the nutritional analysis for each menu. *Id.*, ¶ 3. Occasionally, the CI software and Esha programs arrive at different nutritional values for a particular food item. When that occurs Defendant Carney works with CI to analyze the results and determine the final nutritional content for the food item. *Id.,* ¶ 5.

On March 22, 2010, Defendant Carney sent CI the finalized nutritional information for the two proposed Ramadan box meals. On May 22, 2010, Defendant Carney checked nutritionals for the Halal meats and the Kaiser Roll that were to be included in the 2010 Ramadan box meals and noticed that the software he used had overstated the calorie content for the Halal meats and the Kaiser Roll. Defendant Carney corrected the inaccuracy and notified Jay Jackson of the change to the nutritional information. ECF No. 26-1, Exhibit 2 (Carney Decl.), p. 20, ¶¶ 10-12.

On May 27, 2010, a memorandum regarding the new Ramadan procedures was posted to all offenders from Ron Fraker, Superintendent of CBCC. The memorandum advised, among other things, that there would be no hot meals provided during Ramadan and that all facilities would be purchasing their Ramadan meal trays from CI "which have been reviewed and approved to be nutritional." ECF No. 37, Attachment B, p. 13.

REPORT AND RECOMMENDATION  - 7

In June 2010, Mr. Powers and Inmate Daniel C. Carter met with CBCC Chaplain Donald Duncan in an attempt to resolve problems that they felt the new Ramadan policy would case. ECF No. 36 (Powers Decl.), p. 3, ¶ 11.

On July 19, 2010, three weeks before the 2010 Ramadan fast, Inmate Harry Whitman[2] filed an injunctive action in Thurston County Superior Court, Case No. 10-2-01754-0. The action was unsuccessful. Mr. Powers claims that Defendant Jackson "perjured" himself in the Thurston County case when he falsely declared, *inter alia,* that "box one provides an offender with 2620 calories, box two provides an offender with 2618 calories, and the Halal bologna or salami provides 920 calories, and that offenders receive sufficient calories from the cold boxed meals." ECF No. 36 (Powers Decl.), p. 5, ¶ 16. According to Mr. Jackson, however, the declaration he provided in that case was based on the nutritionals available at the time. It was not until the next day that Mr. Jackson found issues with the actual nutritional content of the Ramadan meals and the deficiencies were corrected and forwarded to food managers on August 10, 2010. *See* ECF No. 82 (Declaration of Jay Jackson), p. 2, ¶¶ 4-5.

Thus, it is clear that the August 9, 2010 affidavit that Defendant Jackson submitted to the Thurston County Superior Court was inaccurate. Although Mr. Powers attempts to depict this inaccuracy as "perjury," he fails to provide any admissible evidence to show that Defendant Jackson knew the information he provided to the Superior Court was incorrect when he provided the information. Further, as discussed below, Mr. Jackson corrected the information one day later on August 10, 2010 when he learned of his error. In addition, prison officials supplemented the box meals to provide additional calories to meet the caloric goals defined in DOC policy. ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 5, ¶ 15 and Attachment C, p. 16.

---

[2] Mr. Whitman has a pending action in this court. See *Whitman v. DOC, et al.,* Case No. C11-5457BHS/KLS.

REPORT AND RECOMMENDATION - 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

On August 10, 2010, the day before the start of Ramadan, a CBCC staff member notified Defendant Jackson that some offenders had raised concerns about the meals, specifically about the amount of calories that were to be provided.  ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 4, ¶ 10.   The staff member sent copies of the box meal labels to Defendant Jackson.  *Id.*; see also *Id.* Attachment A.  After he reviewed the box meal labels, Defendant Jackson realized that the calories indicated on the labels did not reflect the original caloric values that had been planned for the Ramadan box meals.  *Id*., p. 4, ¶ 11.

Defendant Jackson contacted CI to verify that the lower calorie box meals delivered to CBCC were supplied to all facilities and were not just an anomaly.  He was told that all facilities received the lower calorie box meals and that CI would re-enter the nutritionals into their system.  Additionally, Defendant Jackson discovered the meals' nutritional label misstated the calories because the meals contained more calories than were indicated on the labels.  ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 4, ¶ 12.  When CI re-entered the nutritional information, it turned out that the box meals contained additional calories totaling 1920 calories. *Id.*; *see also id.* Attachment B; ECF No. 26-1, Exhibit 2 (Carney Decl.), pp. 20-21, ¶¶ 12-13.  Because the calorie total was still short, Defendant Jackson contacted Defendant Carney and they discussed how to supplement meals with additional calories to meet the caloric goals defined in DOC policy.  ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 5, ¶ 13; Exhibit 2 (Carney Decl.), p. 21, ¶ 13.

On August 10, 2010, Defendant Jackson sent the following email to all food service managers:

> This is important information about Ramadan and needs to be implemented today to ensure nutritional compliance for those participating in Ramadan.

REPORT AND RECOMMENDATION  - 9

The original Ramadan box nutritional information was incorrect, the actual calories for the Ramadan box is less than 2600 calories and additions will need to be made to make up for these calories.

The list of items contained in the box is correct with the exception of one fortified drink packet is included instead of two and the nutritional information on the Ramadan box is incorrect, both of these items will be corrected on future boxes as they are made for future deliveries. Review future deliveries for updated information.

To account for the calories the following additions must be made:

- Male and female offenders participating in Ramadan should receive one fortified drink until new Ramadan boxes arrive with two packets, at that time discontinue the second packet provided by Foodservice because the second milk will be in the box.
- Male offenders will need to be provided one of the following options each day as an addition to the Ramadan box. These options can be packed in a paper bag.
  1. One blue snack and one yellow snack or the equivalent – two peanut butter packets, one jelly packet, two slices bread or another two bread item and four packets of crackers.
  2. One piece fruit, two packets of cookies, two slices of bread or equal, one salad dressing, and one mustard.

ECF No. 26-1, Exhibit 1 (Jackson Decl.), p. 5, ¶ 15 and Attachment C, p. 16.

With the supplements provided with the tray lunch, the average daily calories provided during Ramadan was 2724 calories. *Id.* (Jackson Decl.), p. 5, ¶ 16.

In response to Defendant Jackson's email of August 10, 2010, CBCC's food service manager Jamie Calley decided to implement the second option outlined in Mr. Jackson's email because the food items were readily available to CBCC. ECF No. 26-1, Exhibit 3 (Declaration of Jamie Calley), p. 38, ¶¶ 5-6. The first Ramadan box meal was handed out at CBCC on August 10, 2010, the day before Ramadan was set to begin. On that day, the offenders observing Ramadan would have received their standard three meals in addition to the Ramadan box meal for August 11, 2010. ECF No. 26-1, Exhibit 3 (Calley Decl.), pp. 38-39, ¶ 8. To the best of

REPORT AND RECOMMENDATION  - 10

Defendant Calley's recollection, the supplemental food items were provided at the first Ramadan meal and all box meals contained the full caloric value as set forth by Defendant Jackson and Defendant Carney.  Defendant Calley believes that the longest delay in providing the supplemental food items would have been one day and all offenders observing Ramadan would have received their full box meals by August 11, 2010 for consumption on August 12, 2010.  *Id.*

On August 11, 2010, Defendant Carney sent Defendant Jackson the nutritional information for the additions to the Ramadan box meals.  ECF No. 26-1, Exhibit 2 (Carney Decl.), pp. 21-22, ¶ 16.  Defendant Carney noticed that the nutritional information for the Halal meat was incorrect and he updated the nutritional information.  Thus, the bologna Ramadan box meal with the supplements provided 2698 calories and the salami Ramadan box meal with the supplements contained 2749 calories.  *Id.*

During Ramadan 2010, Jamie Calley met with some offenders who stated objections to the box meals because they contained too many carbohydrates and sugars.  Ms. Calley states that the offenders were also upset because they were no longer given a hot meal, but were not objecting to the overall caloric content of the box meals.  Ms. Calley states that she emailed the offenders' concerns to Brent Carney, who inquired whether the box meals included the correct amount of Halal meat.  Ms. Calley states that the amount of Halal meat provided was not an issue for the inmates.  ECF No. 26-1, Exhibit 3 (Calley Decl.), p. 39, ¶ 9.  According to Inmate Daniel C. Carter, he and Mr. Powers attended the meeting with Defendant Calley and they expressed concerns that Ramadan participants were not given fiber, fruit, and vegetables that other inmates were receiving.  ECF No. 37, Exhibit 2, Declaration of Daniel C. Carter, p. 67, ¶ 3; ECF No. 36 (Powers Decl.), p. 11, ¶ 33. According to Inmate Carter and Mr. Powers, Defendant

REPORT AND RECOMMENDATION  - 11

Calley stated that she was only authorized to give them food that had been authorized for Ramadan 2010.  *Id.*

Ms. Calley states that she responded to Level II grievances filed over the Ramadan box meals, met with offenders in two groups and with a few offenders individually, reviewed pertinent DOC policies and guidelines, and consulted with DOC staff.  She states that it was her understanding that the Ramadan box meal and supplemental food items provided adequate nutrition and calories.  ECF No. 26-1, Exhibit 3 (Calley Decl.), p. 39, ¶ 10.

In an email dated August 13, 2010, Ms. Calley notified Jay Jackson, Brent Carney, and others, that there "has been a lot of complaining here about the nutritional content of the Ramadan meals.  Several offenders who are participating have approached me about the high level of carbs and sugar in the meals."  ECF No. 37-1, Exhibit F, p. 46.

On August 12, 2010, the day after Ramadan 2010 began, Mr. Powers filed a grievance. ECF No. 26-1, p. 68 (Log No. 1017988).  Mr. Powers asked to be provided with at least two box lunches with some form of fresh vegetables and fruit or one boxed lunch and one hot meal.  *Id.* He claimed that the box meal he was given on August 12, 2010 contained 1770 calories.  *Id.*  A revised version of Grievance No. 1017988 dated August 25, 2010 indicates that the response was omitted from the original version.  The response from Denise Larson in the revised version on September 1, 2010, is as follows:

> Your concerns regarding the calorie content of the Ramadan meal box have been addressed.  To ensure nutritional standards are met, supplemental items will be provided.  Thank you for bringing this to our attention.

ECF No. 37, Attachment E, p. 34.

REPORT AND RECOMMENDATION  - 12

On September 2, 2010, Mr. Powers appealed Grievance No. 1017899 to Level II, stating that his concerns had not been addressed in any meaningful way.  ECF No. 27, Attachment E, p. 35.  He received the following response from Ronald Fraker on September 16, 2010:

> Food Manager 4 J. Calley investigated this complaint.  During the investigation she reviewed the initial complaint, response and appeal to Level II.  She also, reviewed the pertinent policies, staff and offender notices, and the guidelines and procedures for serving the approved Ramadan box meals and supplemental sacks.  She also met with you and consulted with DOC staff.
>
> All information gathered and received indicates that according to a review by a dietician, the Ramadan box meal and supplemental sack provide adequate nutrition and calories.
>
> If you have any health concerns, you have the option of signing up for sick all [sic] and/or declaring a medical emergency.

ECF No. 37, Attachment E, p. 35.

Mr. Powers appealed Grievance No. 1017888 to Level III and asked to be compensated $300.00 per day for having to consume the Ramadan 2010 meals.  He also asked that the Ramadan food service policy be changed to provide calorically and nutritionally adequate meals in the future.  ECF No. 37, Attachment E, p. 36.  On October 13, 2010, the appeal was denied. *Id.*

Medical records provided by Mr. Powers indicate that he was seen by Dr. Clifford J. Johnson, the Medical Director of CBCC, on August 16, 2010.  In his report, Dr. Johnson states that Mr. Powers complained of "loose stools and stomach ache, primarily in the left lower quadrant for about 3 days.  He thinks it might be due to the Ramadan fasting."  ECF No. 37, Attachment F, p. 44.  Dr. Johnson diagnosed diarrhea and prescribed Loperamide for the next two days.  He also noted that Mr. Powers had not had any labs since 2008 and wanted to have some done. *Id.*

REPORT AND RECOMMENDATION  - 13

Dr. Johnson saw Mr. Powers again on September 8, 2010.  In his report, Dr. Johnson states that Mr. Powers "is here with constipation.  He is on the final 2 days of his 30 day fast and is interested in his lab results.  He is having mild stomach cramping from time to time and thinks it is related to the fact that he is constipated."  ECF No. 37, Attachment F, p. 46.  Dr. Johnson diagnosed constipation and cerumen (earwax).  Dr. Johnson gave Mr. Powers a packet of Milk of Magnesia and a prescription of Debrox drops for the cerumen.  *Id.*

Inmate Carter states in his declaration that Mr. Powers complained of stomach pain through Ramadan and often could not perform the long Ramadan prayers as a result.  ECF No. 37, Exhibit 2 (Carter Decl.), p. 67, ¶ 3.

Mr. Carney states that the estimated energy or caloric requirement is defined as the amounts of energy that need to be consumed by an individual to sustain a stable body weight in the range desired for good health.  The Dietary Reference Intakes for estimated energy requirements for men is based on their age, physical activity level and their body weight.  These estimated caloric requirements vary widely.  The energy requirement for an average thirty year old male ranges from 1850 calories a day for a lean male with sedentary physical activity level, to 3200 calories a day for a heavier male with an active physical activity level.  ECF No. 26-1, Exhibit 2 (Carney Decl.), p. 22, ¶ 17.

A mainline meal provides an average of 2830 calories per day to meet DOC's recommended caloric guidelines for males.  DOC's guidelines for mainline meals for males are based on a range of between 2700 and 3000 calories per day.  ECF No. 26-1, Exhibit 2 (Carney Decl.), p. 22, ¶ 18; *see also id.*, Attachments A and 1.  The range was set because actual daily calories of meals may vary plus or minus 300 calories per day and because the caloric range was made to meet the need of the diverse male inmate population.  *Id.*  According to Mr. Carney, the

calorie level for Ramadan meals was set at 2700 calories per day to stay within DOC guidelines of 2700 to 3000 calories per day, a range which is well above USDA Dietary Reference Intake recommendations. *Id.*

Also according to Mr. Carney, the errors that were made in the packaging and calculations of the Ramadan meals resulted in Ramadan Box meals providing approximately 1900 calories per day. The health ramifications of eating 1900 calories per day would result in no more than two pounds weight loss per week or approximately eight pounds of weight loss during the 30 days of Ramadan based on scientific evidence of weight loss. An eight pound weight loss in one month is not considered significant and should not cause adverse health consequences. ECF No. 26-1, Exhibit 2 (Carney Decl.), pp. 22-23, ¶ 19. In addition, the lower calorie Ramadan box meals were corrected with supplemental foods on site. *Id.*, p. 23, ¶ 19.

In his Declaration filed in response to Defendants' motion for summary judgment, Mr. Powers claims that the 2010 Ramadan box meals contained the same food components that previously made up "Ramadan Fasting Lunch Trays," less one peanut butter packet and one drink mix, for a total of 1770 and 1830 calories, respectively for the Bologna and Salami trays. He bases this claim on his comparison of nutritional fact labels. ECF No. 36 (Powers Decl.), p. 3, ¶¶ 8-9, Attachment A, pp. 8-11 (labels from Ramadan fasting trays). Mr. Powers claims that the box meal he was given was no more than a small cardboard tray "equivalent to what one would get as a 'nacho tray' at a 7-11 store. He states that the supplement he was given consisted of an apple, drink, cookies, salad dressing, mustard package, and two slices of wheat bread. ECF No. 36 (Powers Decl.), p. 8, ¶¶ 22-23. He claims that together, the box meal and supplement contained approximately 1,917 calories. Id., p. 8, ¶ 23. He also claims that 907 calories of the 1,917 calories were cookies, cakes, and condiments. *Id.*

REPORT AND RECOMMENDATION - 15

Mr. Powers also states that a few days into the 2010 Ramadan fast, he noticed that the box meals served were missing nutritional labels that had been "torn off". ECF No. 36 (Powers Decl.), p. 12, ¶ 35. In her interrogatories, Defendant Calley stated that she did not remember removing labels from any of the 2010 Ramadan box meals, that she does not remember instructing anyone else to do so, and does not remove labels or instruct others to do so as a general practice. ECF No. 37, p. 54.

From August 11, 2010 to September 9, 2010, Mr. Powers had access to and bought items from the offender store during the Ramadan celebration, including but not limited to: refried beans, chili garlic sauce, and 2 cases of chili Ramen. ECF No. 26-1, Exhibit 4, Declaration of Yvette Stubbs, DOC Legal Liaison Officer, p. 41, ¶ 3 and Attachment A (pp. 44-48).

According to Ms. Stubbs, DOC Policy 440.00 (XIII) does not allow offenders to trade, sell, buy, barter, loan, or give away any personal property to another offender. ECF No. 26-1, Exhibit 4 (Stubbs Decl.), p. 42, ¶ 4. According to Mr. Powers, it was his responsibility as a leader of the Islamic group to provide those inmates who could not sign up for Ramadan with some kind of food. He states that he purchased one case of chili Ramen soup on August 24, 2010 and another case on August 30, 2010 to donate to inmates who needed them. He also states that it is common practice in the DOC to give away food items as long as one asks the staff on duty. ECF No. 36 (Powers Decl.), p. 10, ¶ 31. Mr. Powers also confirms that on August 10, 2010, he purchased one 8 ounce bag of refried beans. *Id.* Mr. Powers does not identify the inmates to whom he allegedly gave the Ramen soup.

Mr. Powers claims that the 2010 Ramadan participants were not given access to the "free run" on fruit and vegetables provided to mainline inmates because the items were not on the fasting approved list. ECF No. 36 (Powers Decl.), pp. 10-11, ¶¶ 32-33. Inmate Faheem Siddiq

REPORT AND RECOMMENDATION - 16

states that a meeting was held at the CBCC in 2011 for the purpose of improving DOC policies regarding Ramadan meals.  At that time, the issue of extra fiber, fruit and vegetables was raised again and Defendants Jackson and Calley responded that only approved list foods were given out and the giving out of more food could be a security risk.  ECF No. 37, Exhibit 3, Declaration of Faheem Siddiq, p. 75.  Mr. Powers contends that this evidence contradicts the interrogatory answer of Defendant Calley, where she stated that there "was never a request by inmates in general population observing Ramadan in 2010 for an option of *bran fiber* with their meals." ECF No. 37, p. 53 (emphasis added).

Mr. Powers alleges that the 2010 Ramadan policy restricted his ability to purchase traditional food items for the Eid ul-Fitr feast.  Under the new policy, juice and a pastry or cookie would be provided by the DOC for the event.  ECF No. 7, p. 21.  Mr. Powers states that the Defendants scheduled the feast for September 18, 2010, seven days after the end of the Ramadan fast, that the September 18, 2010 was cancelled at the last moment, and that he was unable to participate in the feast.  *Id.*, p. 22.

According to the DOC Handbook of Religious Beliefs and Practices, Eid ul-Fitr is a celebration which marks the end of Ramadan.  ECF No. 26-1, Exhibit 5, Declaration of Donald Duncan, p. 51, ¶ 7.  Donald Duncan is a chaplain at CBCC who conducts, coordinates, and supervises religious activities.  *Id.*, p. 25, ¶ 1.   Eid ul-Fitr consists of an obligatory prayer.  In addition, a celebration with or without food may be held.  *Id.*, p. 51, ¶ 7.

In November 2009, the Eid ul-Fitr prayer session was scheduled for September 10, 2010, the first day after Ramadan.  The Eid ul-Fitr feast was scheduled for September 14, 2010, which was the first day after Ramadan that facilities would be available.  These events were advertised with posters and on the monthly calendars. ECF No. 26-1, Exhibit 5 (Duncan Decl.), pp. 50-51,

REPORT AND RECOMMENDATION  - 17

¶¶4, 8-11; Attachment A, p. 7.  Mr. Powers signed up for and attended the prayer session.  *Id.,* p. 52, ¶¶ 12-13; Attachment C, p. 12.

Chaplain Duncan states that on or about September 10, 2010, Mr. Powers, as the designated Imam or leader of the group, approached him and told him that the Islamic group's annual Eid ul-Fitr feast could not go forward because the group was not ready for the event and that they were going to cancel it even though the event was already scheduled and the guests were approved.  *Id.*, p. 52, ¶ 15.   The Eid Ul Fitr Annual Event was rescheduled to November 16, 2010.  That day, however, was designated as a modified lock down day which limited the number of staff at the institutions and restricted movement.  The event was rescheduled to November 30, 2010, but was then cancelled by the leadership of the Islamic group.  *Id.*, ¶ 17.  A separate event was scheduled on September 21, 2010 for Nation of Islam inmates proceeded as scheduled.  *Id.*, ¶ 16.

In November 2011, changes to the Ramadan fasting menu were made, including hot meals with vegetables.  *See, e.g.,* ECF No. 37, Attachment I, pp. 58-59.  The proposed meals for Ramadan 2011 were considered a "vast" improvement.  *Id.*, Attachment H, p. 56.

### SUMMARY JUDGMENT STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato*

REPORT AND RECOMMENDATION  - 18

*Johnson*, 212 F.3d 528, 532 (9th Cir.2000).  A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law.  *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).  The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).  A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001).  This is true even when a party appears *pro se*. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

Where the nonmoving party is *pro se*, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

REPORT AND RECOMMENDATION  - 19

**DISCUSSION**

1

2  **A.     Eighth Amendment**

3         In his complaint, Mr. Powers alleged that the policies and procedures implemented by

4  Defendants during Ramadan 2010 resulted in nutritionally deficient meals that caused him to

5  suffer "notable weight loss, diminished health and pain that required medical attention," and

6  violated his Eighth Amendment right to be free of unnecessary pain and punishment.  ECF No.

7  7, pp. 25-26, ¶ 7.8.

8

9         Inmates alleging Eighth Amendment violations based on prison conditions must

10 demonstrate that prison officials were deliberately indifferent to their health or safety by

11 subjecting them to a substantial risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825, 834

12 (1994); *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995).  Prison officials display a

13 deliberate indifference to an inmate's well-being when they consciously disregard an excessive

14 risk of harm to the inmate's health or safety.  *Farmer*, 511 U.S. at 838-40; *Wallis*, 70 F.3d at

15 1077.  The Eighth Amendment standard requires proof of both an objective and a subjective

16 component.  *Hudson v. McMillian*, 503 U.S. 1 (1992).  If either of these components is not

17 established, the court need not inquire as to the existence of the other.  *Helling v. McKinney*, 509

18 U.S. 25, 35 (1993).

19

20        First, the deprivation alleged must objectively be sufficiently serious, resulting in a denial

21 of the "minimal civilized measures of life's necessities."  *Farmer*, 511 U.S. at 834 (*quoting*

22 *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  In proving the objective component, an inmate

23 must establish that there was both some degree of actual or potential injury, and that society

24 considers the [acts] that the plaintiff complains of to be so grave that it violates contemporary

25

26

REPORT AND RECOMMENDATION  - 20

standards of decency to expose anyone unwillingly [to those acts]. *Helling*, 509 U.S. at 36; *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Second is the subjective component that the prison official possesses a sufficiently culpable state of mind: "deliberate indifference to inmate health and safety." *Farmer*, 511 U.S. at 834-36. With regard to deliberate indifference, a prison official is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. The subjective component requires proof that the official was: (1) aware of the facts that would lead a reasonable person to infer the substantial risk of serious harm; (2) actually made the inference that the substantial risk of serious harm to the plaintiff existed; and (3) knowingly disregarded the risk. *Id*.; *see also Farmer*, 511 U.S. at 844.

With regard to food, the courts have concluded, "the Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th. Cir.1993) (citation omitted). Only those conditions of confinement that deny a prisoner "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (*quoting Hudson v. McMilliam*, 503 U.S. 1 (1992)). Although the Ninth Circuit has provided no guidance on the quantity of prisoner food necessary to pass constitutional muster, other courts have established guidelines. *See, e.g., Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir.1986) (finding two meals a day sufficient if nutritionally and calorically adequate); *see also Sostre v. McGinnis*, 442 F.2d 178, 186, 193–94 (2d Cir.1971) (finding diets of 2,800 to 3,300 calories per day constitutionally adequate), *overruled on other grounds in Davidson v. Scully,* 114 F.3d 12

REPORT AND RECOMMENDATION  - 21

1    (2d Cir.1997); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir.1982) (finding one meal a day

2    for 15 days, where the meal contained 2,000 to 2,500 calories and was sufficient to maintain

3    health, constitutionally adequate).

4          The record reflects that Defendants made mistakes in the packaging and calculations of

5    the 2010 Ramadan box meals, but the errors were corrected prior to or at the start of Ramadan.

6    For example, on August 10, 2010, after he reviewed labels of both Ramadan box meals,

7    Defendant Jackson realized that the calories indicated on the labels did not reflect the original

8    caloric values that had been planned for the Ramadan box meals.  ECF No. 26-1, Exhibit 1

9    (Jackson Decl.), p. 4, ¶¶ 10-11; *id.* Attachment A.  After the nutritional information was re-

10   entered, it was discovered that the meals actually contained more calories than what was

11   reflected on their labels, but that the caloric level was still too low.  *Id.* (Jackson Decl.), p. 4, ¶

12   12.  On the same day, Mr. Jackson notified all food service managers that the actual calories for

13   the "Ramadan box is less than 2600 calories and additions will need to be made to make up for

14   these calories."  Mr. Jackson's email contained detailed instructions as to how the food service

15   managers should account for the calories, including providing offenders with one of two options

16   of brown bag snacks in addition to the Ramadan box.  ECF No. 26-1, Exhibit (Jackson Decl.),

17   Attachment C, p. 16.  With the supplements provided with the lunch tray, the average daily

18   calories provided during Ramadan was 2724 calories.  *Id.* (Jackson Decl.), p. 5, ¶ 16.

19          According to CBCC's food service manager Jamie Calley, the first Ramadan meal was

20   handed out at CBCC on August 10, 2010, the day before Ramadan was set to begin.  On that

21   day, the offenders observing Ramadan would have received their standard three meals in

22   addition to the Ramadan box meal for August 10, 2010.  On August 11, 2010, the Ramadan

23   participants would have received the Ramadan box meal and the supplemental food items

24

25

26

REPORT AND RECOMMENDATION  - 22

described in the second option in Mr. Jackson's August 10, 2010 email.  Thus, there was only, at most, a one day delay in providing the supplemental food items needed to provide the inmates with a meal containing the full amount the average daily calories.  ECF No. 26-1, Exhibit 3 (Calley Declaration), pp. 38-39, ¶¶ 6-8.  According to Mr. Jackson, the average daily amount of calories provided during Ramadan was 2,724.  ECF No. 38-1, Exhibit 1 (Jackson Decl.), p. 5, ¶ 16.

Mr. Powers claims that he suffered a 15 pound weight loss, headaches, and stomach aches because the food served during Ramadan 2010 was insufficient.  ECF No. 35, pp. 8-9.  Mr. Powers' claimed weight loss of 15 pounds does not appear to be disputed although Defendants dispute that his weight loss was caused by the consumption of the Ramadan box meals and supplemental snacks.  ECF No. 26-1, Exhibit 2 (Carney Decl.), pp. 22-23, ¶ 19.   The dispute is not material, however, because Mr. Powers's medical records do not support a claim of a serious medical condition nor do they support a claim that Defendants were indifferent to Mr. Powers' health.

The medical records reflect that Mr. Powers was seen by Dr. Clifford Johnson on two occasions:  (1) on August 16, 2010, five days after the start of Ramadan 2010, when he complained of loose stools and stomach aches related to his fasting, and (2) on September 8, 2010, three days prior to the end of Ramadan, when he complained of constipation.  ECF No. 37, Attachment F, pp. 44, 46.  Dr. Johnson diagnosed diarrhea on the first occasion and prescribed Loperamide.  Dr. Johnson prescribed constipation on the second occasion and gave Mr. Powers a packet of Milk of Magnesia.  *Id.*

Thus, the record does not reflect that Mr. Powers was denied appropriate medical treatment.  Neither does not record reflect that Mr. Powers suffered any unnecessary pain or

REPORT AND RECOMMENDATION  - 23

injury related to the food served during Ramadan 2010.  Even if the Court were to assume that his ailments were related to the food, or lack of food, served during Ramadan 2010, there is nothing to indicate that these ailments were serious enough to endanger Mr. Powers' health or safety.

The record also reflects that Mr. Powers had access to and in fact bought items from the offender store during Ramadan 2010.  *See*, ECF No. 26-1, Exhibit 4, Declaration of Yvette Stubbs, DOC Legal Liaison officer, Attachment A (pp. 44-48).  Mr. Powers does not dispute that he purchased these items.  Instead, he claims that he purchased the food in order to feed other inmates who could not participate in the Ramadan fast.  ECF No. 36 (Powers Decl.), p. 10, ¶ 31.  Mr. Powers does not identify the "other inmates" to whom he gave food.  Regardless of whether Mr. Powers consumed these items during Ramadan or gave them away, it remains undisputed that he had access to additional items if he felt hungry.

Mr. Powers must also provide admissible evidence that the Defendants acted with deliberate indifference tantamount to criminal recklessness.  *See Farmer*, 511 U.S. at 836.  A "prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 836.  In addition, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*., at 844.

The record reflects that Defendants acted with the intent to provide Mr. Powers and other Ramadan participants with the proper nutrition and calories during Ramadan 2010.  They

corrected the caloric values of the Ramadan meals and when that was not sufficient, they added

supplements to the meals to ensure that the goal of 2700 average calories was met.  Mr. Powers

provides no competent summary judgment evidence to the contrary.

Plaintiff has no Eighth Amendment right to meals of his choice.  Rather, his right extends

to food that is adequate to maintain his health.  *LeMaire,* 12 F.3d at 1456.  He has no

constitutional right to be served a hot meal.  *See., e.g., Cunningham v. Jones,* 567 F.2d 653, 659-

60 (6th Cir. 1977).  There is no medically competent evidence indicating that the food provided

to him during Ramadan 2010 was inadequate to maintain his health.  Even assuming that Mr.

Powers lost 15 pounds and suffered from occasional diarrhea, constipation, and headaches, the

evidence presented here indicates that he was seen by a DOC medical professional and was

treated for his complaints at that time.  There is also no evidence that Mr. Powers sought medical

treatment for his weight loss or indeed that the weight loss posed an immediate danger to his

health and well being.

Viewing the foregoing evidence in the light most favorable to Mr. Powers, the

undersigned concludes that he has failed to raise a genuine issue of material fact to establish a

serious medical need based on his consumption of the food provided during the 2010 Ramadan

fast or that Defendants acted with "deliberate indifference" to his health and safety.   Thus, the

undersigned recommends that Mr. Powers' Eighth Amendment be dismissed.

**B.**     **Plaintiff's RLUIPA Claims**

42 U.S.C. §2000cc is the Religious Land Use and Institutionalized Persons Act

(RLUIPA).  RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a
> person residing in or confined to an institution … even if the burden results from

REPORT AND RECOMMENDATION  - 25

a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §2000cc-1(a).

Defendants cannot be held liable under RLUIPA for monetary damages in their official or individual capacity.  Furthermore, any request for injunctive relief under RLUIPA is now moot as the evidence reflects that any issues relating to the Ramadan meals were resolved prior to the commencement of Ramadan 2010, which has already passed.

**(1)      Monetary Damages – Official Capacity Defendants**

The Ninth Circuit has not ruled on whether RLUIPA allows for money damage claims against state actors in their individual capacity.  *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 n. 3 (9th Cir.2011) ("[t]he Ninth Circuit has not ruled on this issue in a precedential opinion, and we reserve this question for another day").  However, several district courts in the Ninth Circuit have held that RLUIPA does not allow for a damage claim against an individual.  See, e.g., *Florer v. Bales–Johnson*, 752 F. Supp.2d 1185, 1205–06 (W.D. Wash. 2010); *Shilling v. Crawford*, 536 F. Supp.2d 1227, 1234 (D. Nev. 2008); *Brown v. Vail, et al.*, No. CV-08-5091-JPH (E.D. Wash. 2009) (order on motion to dismiss); *Harris v. Schriro*, 652 F. Supp.2d 1024, 1030 (D. Ariz. 2009).

In light of this precedent, the Court recommends that Defendants' motion for summary judgment on the issue of damages under RLUIPA be granted as to all individual defendants.

Mr. Powers' RLUIPA claim against the DOC must also be dismissed because Mr. Powers has failed to show that his right to practice his religion was substantially burdened.

REPORT AND RECOMMENDATION  - 26

Under RLUIPA, a plaintiff "bears the initial burden of going forward with evidence to demonstrate a prima facie claim" that the challenged state action constitutes "a substantial burden on the exercise of his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) (citing *Cutter*, 125 S. Ct. at 2119). "[A] burden is substantial under RLUIPA when the state denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008) (internal quotes omitted). A "'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir.2004). the Supreme Court has found a substantial burden as "where the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (ruling in First Amendment context). Although such "compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Id.* at 718, 101 S.Ct. 1425.

As noted above, the evidence reflects that the DOC provided Mr. Powers and other Ramadan participants with a daily meal and supplements during the 2010 Ramadan fast, which contained an average 2700 calories. Mr. Powers provides no competent summary judgment evidence to the contrary. Although it is clear that Mr. Powers was not satisfied with the quality or quantity of the food provided, he fails to show that the quality or quantity of the food that he was provided constituted a "substantial burden" on his fast or in the exercise of any other religious belief. For example, there is no evidence that he was not allowed to participate in Ramadan, the fast, prayers, reading of the Qur'an or in any other religious activities. Inmate

Carter testifies on Mr. Powers' behalf that Mr. Powers complained of stomach pains and "often could not perform the long Ramadan prayers as a result." ECF No. 37, p. 67.  Mr. Powers alleges that the "the qualitative spiritual experience of Ramadan" was "substantially diminished" because he was not given adequate nutrition and calories during his fast.  However, these conclusory allegations are not supported with evidence nor do they establish that the DOC placed a substantial burden on the exercise of his religious beliefs.

The evidence reflects that Mr. Powers was given one meal that contained approximately 1900 calories due to a mistake in packaging the 2010 Ramadan meals, but the mistake was corrected the next day and thereafter, he received a meal and a supplement that contained an average of 2224 calories.  Therefore, whatever negligible burden there may have been on Mr. Powers' ability to exercise his religious beliefs due to the meals he was served, this burden was not substantial.

**B.     RLUIPA Injunctive Relief**

The jurisdiction of a federal court depends on the existence of a live case or controversy. *Mitchell v. Dupnik*, 75 F.3d 517, 527-28 (9th Cir. 1996).  Courts do not decide questions that cannot affect the rights of litigants in the cases before them. *Id.* at 528.  If an issue in a case is no longer in dispute, or a party receives the requested relief, then the issue may be moot.  The exception to the mootness doctrine for claims capable of repetition yet evading review is not applicable here, because Mr. Powers fails to show that he meets the narrow exemption to mootness doctrine. *See City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983); *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999)

The record reflects that all issues as to the caloric amounts of the Ramadan fast trays were resolved prior to the commencement of Ramadan 2010 and that the corrected caloric

REPORT AND RECOMMENDATION  - 28

amounts were nutritionally adequate.  There is no competent evidence to support Mr. Powers'

allegation against any of the named Defendants that he was intentionally deprived of the calories

intended for all offenders during 2010 Ramadan.  In addition, Mr. Powers acknowledges that

after the 2010 Ramadan, the DOC changed the Ramadan meals to include a hot meal and

vegetables.  ECF No. 36, p. 13, ¶ 40.  Thus, Mr. Powers' claim for injunctive relief under

RLUIPA is moot and Defendants' motion for summary judgment on this claim should be

granted.

**C.      First Amendment Claim (Free Exercise of Religion)**

In his Complaint, Mr. Powers alleges that provision of "1,700 calories of food per day

during the 30 day Ramadan Fast 2010," caused him to be constantly hungry and to suffer hunger

headaches, dizziness, nausea, stomach aches, constipation, diarrhea, lethargy, listlessness, and

the loss of 15 pounds.  He claims that this "substantially diminished the qualitative spiritual

experience of Ramadan," prevented him from or otherwise distracted him from the "spiritually

uplifting aspects" of Ramadan such as being able to concentrate on reading the Quran and

praying.  ECF No. 7, p. 25.

In order to implicate the Free Exercise Clause, the inmate's belief must be religious in

nature and sincerely held.  See *Malik v. Brown,* 16 F.3d 330, 333 (9th Cir. 1994) (internal

quotations and citation omitted); *Shakur v. Schriro,* 514 F.3d 878, 884-85 (9th Cir. 2008)

(adopting the "sincerity test" set forth in *Malik, supra*).  The Defendants do not dispute that Mr.

Powers' beliefs are religious in nature and that they are sincerely held.

Inmates with such beliefs have "[t]he right to exercise [their] religious practices and

beliefs...."  *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (citing *O'Lone v.

Estate of Shabazz,* 482 U.S. 342, 348 (1987).  A free exercise violation occurs when the

defendants burden the practice of an inmate's religion by preventing the inmate from engaging in sincere religious conduct.  See *Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir. 1997), *overruled in part by Shakur,* 514 F.3d at 885.  A mere inconvenience does not give rise to a violation; the burden imposed must be substantial.  *Freeman,* 125 F.3d at 737.

A restriction on an inmate's First Amendment religious rights is valid if it is reasonably related to legitimate penological interests.  *See O'Lone*, 482 U.S. at 349 (*quoting Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).  The burden is on the prison officials to prove that the restriction of the prisoner's exercise of religion was reasonably related to a legitimate penological objective. *See Ashelman v. Wawrzaszek*, 111 F.3d 674, 677–78 (9th Cir.1997) (applying test from *O'Lone and Turner* to determine reasonableness of decision denying Jewish prisoner's request for an all kosher diet).  In making such a determination, the district court should consider four factors:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and the governmental objective itself must be a legitimate and neutral one. A second consideration is whether alternative means of exercising the right on which the regulation impinges remains open to prison inmates. A third consideration is the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources. Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

*Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir.1987) (citing *Turner*, 482 U.S. at 89–91).

Mr. Powers' First Amendment claim fails.  First, as discussed above, the evidence does not support Mr. Powers' claim that his nutritional needs were not being met or that Defendants knowingly deprived him of calories because of his religion.  Further, Mr. Powers has not shown that he was substantially burdened in the practice of his religion.  He alleges only that "the qualitative spiritual experience of Ramadan" was "substantially diminished" because he was

1   hungry and suffered from headaches, diarrhea and constipation, which he attributes to the lack of

2   food.  ECF No. 7, p. 37.  These conclusory statements fall far short of establishing a substantial

3   burden.

4          Viewing the foregoing in the light most favorable to Mr. Powers, the undersigned

5   concludes that Mr. Powers has failed to raise a genuine issue of material fact as to his claim that

6   the Ramadan 2010 policies and meals burdened the practice of his religion.  As noted above, the

7   evidence does not support Mr. Powers's characterization of the amount of calories in the

8   Ramadan meals or the effect of those calories.  Moreover, if he was still hungry during the fast,

9   he had access to additional food.  *See,e.g., Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 810-12

10  & n. 8 (8th Cir. 2008) (prison's meal plan regulations did not substantially burden Muslim

11  inmate's free exercise rights where inmate had access to only vegetarian entrees and some of

12  those entrees he had to pay for himself).

13         In his complaint, Mr. Powers alleges that the defendants also burdened the practice of his

14  religion by failing to schedule the Eid ul-Fitr feast in a timely manner and therefore, he was

15  unable to attend the feast.  ECF No. 7, p. 22.  As discussed below, this claim must be dismissed

16  because Mr. Powers failed to exhaust his administrative remedies regarding this claim.

17  Moreover, the record does not reflect that any of the Defendants were involved in the scheduling

18  or planning of the Eid ul-Fitr feast.  In fact, according to Chaplain Duncan, the rescheduling and

19  ultimate cancelling of the Eid ul-Fitr feast was done at the express request of Mr. Powers, the

20  designated leader of the Islamic group.  ECF No. 26-1, p. 52, ¶¶ 15, 17.

21         Based on the foregoing, the undersigned concludes that Mr. Powers has not demonstrated

22  that the Defendants burdened the practice of his sincere religious practices.  Therefore, the Court

23

24

25

26

REPORT AND RECOMMENDATION  - 31

need not reach the *Turner* analysis.  The undersigned recommends that Defendants' motion for summary judgment on this claim be granted.

**D.      Claims Relating to Eid Ul Feast – Failure to Exhaust**

The PLRA at 42 U.S.C. §1997e(a) mandates that:

> No action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison or other correction facility, until such administrative remedies as are available are exhausted.

In interpreting §1997(e)(a), the United State Supreme Court determined that Congress enacted this provision in order to reduce the quantity and improve the quality of prisoner suits. *Porter v. Nussle*, 534 U.S. 516 (2002).  By mandating exhaustion, Congress enabled corrections officials to address prisoner complaints internally, often resulting in the correction of administrative problems, the filtering out of frivolous claims, and ultimately a clear record of the controversy.  *Id.*  Where exhaustion was once discretionary, it is now mandatory.  *Id.*  "All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'"  *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 739 [2001]).  Section 1997e(a)'s  exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences.  *Id.* at 520.  An inmate must attempt to fully exhaust available administrative remedies in a timely manner.  *Woodford v. Ngo*, 548 U.S. 81 (2006).  Failure to exhaust administrative remedies generally results in dismissal without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003).

An offender in DOC's custody can file a grievance for a wide range of aspects of his incarceration, including for the actions of staff.   ECF No. 26-1, Exhibit 6, Grievance Program Manager, p. 64, ¶ 4.  The grievance procedure consists of four levels of review:

REPORT AND RECOMMENDATION  - 32

Level 0 - Complaint or informal level. The grievance coordinator at the prison receives a written complaint from an offender on an issue about which the offender wishes to pursue a formal grievance.  At this complaint level, the grievance coordinator pursues informal resolution, returns the complaint to the offender for rewriting, returns the complaint to the offender requesting additional information, or accepts the complaint and processes it as a formal grievance.

Level I - Grievances against policy, procedure, or other offenders, and grievances processed as emergencies.  The local grievance coordinator is the respondent at this level.

Level II - Appeal. Offenders may appeal Level I grievances to this level. Staff conduct grievances are initiated at this level.  All appeals and initial grievances received at Level II are investigated, with the prison superintendent being the respondent.

Level III - Appeal. Offenders may appeal all Level II responses except emergency grievances to Department headquarters in Tumwater, where they are reinvestigated.  Administrators are the respondents.

*Id.*, pp. 64-65, ¶ 6.

Mr. Powers alleges that the Eid ul-Fitr feast to celebrate the completion of Ramadan was not held within three days of completion of Ramadan in 2010.  This allegation is a grievable issue under the DOC grievance system.  *Id.*, p. 64, ¶ 4..  Although Mr. Powers has access to a grievance procedure, he failed to complete the grievance process with respect to the timing of the 2010 Eid ul-Fitr feast.  Mr. Powers did file a grievance regarding the 2010 Ramadan meal box (Grievance No. 1017988), but he filed no grievance regarding the timing or scheduling of the Eid ul-Fitr feast.  *Id.*, p. 66, ¶¶ 12-13; Attachment A.

Because Mr. Powers failed to timely file a grievance regarding this portion of his complaint, the undersigned recommends that his claims relating to the timing of the Eid ul-Fitr feast be dismissed without prejudice for failure to exhaust.

//

//

REPORT AND RECOMMENDATION  - 33

**E.      Fourteenth Amendment Claims**

**1)      Due Process**

The Due Process Clause of the Fourteenth Amendment protects prisoners from being deprived of life, liberty, or property without due process of law.  *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).  "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).  State statutes and prison regulations may grant prisoners liberty interests sufficient to invoke due process protections.  *Meachum v. Fano*, 427 U.S. 215, 223–27, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).  However, the Supreme Court has significantly limited the instances in which due process can be invoked.  Pursuant to *Sandin v. Conner*, 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), a prisoner can show a liberty interest under the Due Process Clause of the Fourteenth Amendment only if he alleges a change in confinement that imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life."  *Id*. at 484 (citations omitted); *Neal v. Shimoda*, 131 F.3d 818, 827–28 (9th Cir.1997).

Therefore, to establish a due process violation, a plaintiff must first show the deprivation imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life.  *Sandin*, 515 U.S. at 483–84.  A plaintiff must allege "a dramatic departure from the basic conditions" of his confinement that would give rise to a liberty interest before he can claim a violation of due process.  *Id*. at 485; *see also Keenan v. Hall*, 83 F.3d 1083, 1088–89 (9th Cir.1996), amended by 135 F.3d 1318 (9th Cir.1998).

Mr. Powers argues that his "diet is a protected interest with standards" and "that interest was taken away without due process."  ECF No. 35, p. 11.  He offers no legal authority for this

REPORT AND RECOMMENDATION  - 34

proposition.  In addition, there is no evidence that Defendants denied Mr. Powers food or that *statewide* changes to DOC's Ramadan food policies were intended to punish Mr. Powers.  As discussed above, the evidence reflects that the Defendants acted with the intent to provide Mr. Powers and other Ramadan participants with the proper nutrition and calories during Ramadan in 2010.  The evidence also reflects that Mr. Powers received food adequate to maintain his health, which is all that the Eighth Amendment requires.  *Hoptowit,* 682 F.2d at 1246; *LeMaire*, 12 F.3d at 1456; *Keenan v. Hall*, 83 F.3d at 1091.  There is no evidence to suggest that any changes in Mr. Powers' diet were of such a "dramatic departure from the basic conditions" of his confinement that would give rise to a liberty interest.  Moreover, Mr. Powers, along with all other Ramadan participants, received notice in May 2010 of the changes that were to take effect with Ramadan 2010.

Mr. Powers has failed to allege a liberty interest, and thus, has failed to state a due process claim.  The undersigned recommends that this claim be dismissed.

### 2)   Equal Protection

Mr. Powers argues that Defendants placed him in a "Ramadan class of similarly situated individuals and that as prisoners, they are all entitled to caloric and nutritional standards regardless of religion or race."  ECF No. 35, p. 11.  According to Mr. Powers, the Muslim population of CBCC was fed less than other similarly situated inmates in general population and that inmates not participating in the Ramadan fast were given extra food that was not given to the fasting inmates.  *Id.*

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  In order to prevail on an Equal Protection claim, a plaintiff must show differential

treatment from a similarly situated class, *see Washington v. Davis*, 426 U.S. 229, 239 (1976), and "intentional or purposeful discrimination."  *Draper v. Rhay*, 315 F.2d 193, 198 (9th Cir. 1963), *cert. denied*, 375 U.S. 915 (1963); *City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188, 194 (2003) ("[P]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.") (brackets and internal quotation marks omitted); *Flores v. Morgan Hill Unified School Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003).  This "discriminatory purpose" must be clearly shown since a purpose cannot be presumed.  *Snowden v. Hughes*, 321 U.S. 1, 8, (1944).

The Equal Protection Clause does not require conditions, practices, and rules at county and state correctional facilities to be identical.  *Cooper v. Elrod*, 622 F. Supp. 373 (N.D. Ill. 1985).  The United States Supreme Court has observed that "showing that different persons are treated differently is not enough without more, to show a denial of Equal Protection."  *Griffin v. County Sch. Bd. of Prince Edward County*, 377 U.S. 218, 230 (1964).  Moreover, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).

A plaintiff must demonstrate that he was "treated differently … *because* [he] belonged to a protected class."  *Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995) (citing *Divers v. Department of Corr.*, 921 F.2d 191, 193 (8th Cir. 1990)) (emphasis added).  Prisoners are not a suspect class.  *Moss v. Clark*, 886 F.2d 686 (4th Cir. 1989); *see Thornton v. Hunt*, 852 F.2d 526, 527 (11th Cir. 1988); *Pryor v. Brennan*, 914 F.2d 921 (7th Cir. 1990).   "Ramadan prisoners" are not a suspect class.

*//*

*//*

REPORT AND RECOMMENDATION  - 36

Mr. Powers has failed to allege any facts or provide evidence to raise a genuine issue of material fact to support his Equal Protection claim.  First, Mr. Powers cannot demonstrate that he was treated differently from other similarly situated persons, *i.e.,* offenders observing Ramadan. All offenders observing Ramadan were provided with the same Ramadan box meals and supplements which provided sufficient nutritional content.  It is undisputed that the 2010 Ramadan policies were implemented throughout DOC.  *See, e.g.,* ECF No. 26-1, Exhibit 1 (Jackson Decl.), Attachment C, p. 16.

Mr. Powers compares himself to non-fasting offenders.  However, the evidence reflects that DOC's mainline alternative meal provides an average of 2830 calories per day and the Ramadan meals provide an average of 2700 calories per day, which are both within DOC guidelines and above USDA dietary recommendations.  ECF No. 26-1, Exhibit 2 (Carney Decl.), p. 22, ¶ 18.   With the supplements provided, the average daily calories provided during Ramadan was 2724 calories.  ECF No.  26-1, Exhibit 1, (Jackson Decl.), p. 5, ¶ 16.  Therefore, Mr. Powers' claims that he was treated differently than other similarly situated persons fails and his claim of violation of the Equal Protection clause of the Fourteenth Amendment fails.

Based on the foregoing, the undersigned recommends that Mr. Powers' Fourteenth Amendment equal protection claim be dismissed.

## F.     Failure to Allege Personal Participation

Defendants argue that Plaintiff's claims against Defendants Vail and Fraker should be dismissed for failure to allege their personal participation.  ECF No. 60, pp. 28-29.  As to Defendant Fraker, the Court finds that Mr. Powers sufficiently alleged his personal participation.

In order to state a civil rights claim, a plaintiff must set forth the specific factual basis upon which he claims each defendant is liable.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir.

REPORT AND RECOMMENDATION  - 37

1980).  A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of

supervisory responsibility or position.  *Monell v. Dept. of Soc. Serv. Of New York*, 436 U.S. 658,

694 n.58 (1978); *Padway v. Palches*, 665 F.2d 965, 967 (9th Cir. 1982).  Rather, each defendant

must have personally participated in the acts alleged.  *Id.*  "A supervisor is only liable for

constitutional violations of his subordinates if the supervisor participated in or directed the

violations, or knew of the violations and failed to act to prevent them."  *Taylor v. List*, 880 F.2d

1040, 1045 (9th Cir.1989).  Vague and conclusory allegations of official participation in civil

rights violations are not sufficient to withstand a motion to dismiss.  *Peña v. Gardner*, 976 F.2d

469, 471 (9th Cir. 1992).

Defendant Fraker personally participated in sending emails to Ramadan participants,

DOC superintendents, the chaplain, and Defendant Calley, outlining the procedures for the

Ramadan 2010 events at CBCC.  ECF No. 37, p. 13, Attachment B.  He also responded to Mr.

Powers' September 2, 2010 Level II appeal of Grievance No. 1017899, stating, in part, that the

"information gathered and received indicates that according to a review by a dietician, the

Ramadan box meal and supplemental sack provide adequate nutrition and calories.  ECF No. 27,

Attachment E, p. 35.  As discussed above, however, claims against Defendant Fraker should be

dismissed because Mr. Powers has failed to show that Defendant Fraker violated his

constitutional rights.

Mr. Powers' claims against Defendant Vail should be dismissed for failure to allege

personal participation.  Mr. Powers sues Defendant Vail in his supervisory capacity only.  In his

complaint, Mr. Powers states that Defendant Vail, as Secretary of the DOC, was charged with

the responsibility for the overall operations of DOC, including the development, implementation,

formulation, ratification, and enforcement of all DOC policy for the management of DOC and is

REPORT AND RECOMMENDATION  - 38

responsible for the care, custody and protection of inmates.  ECF No. 7, p. 5.  Mr. Powers

provides no factual allegations or evidence to support a claim that Defendant Vail personally

participated in depriving him of any constitutional right.  Accordingly, Defendant Vail should be

dismissed from this action.

**G.     DOC is Not a Person Under 42 U.S.C. § 1983**

       A governmental agency that is an arm of the state is not a person for purposes of §1983.

*See Howlett v. Rose*, 496 U.S. 356, 365 (1990); *Flint v. Dennison*, 488 F.3d 816, 824-25 (9th Cir.

2007); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997); *Hale v.

Arizona*, 993 F.2d 1387, 1398-99 (9th Cir. 1993) (en banc).  A state's department of corrections

is an arm of the state for purposes of claims brought under 42 U.S.C. §1983.  *See Alabama v.

Pugh*, 438 U.S. 781, 782 (1978) (per curiam) (suit against state Board of Corrections barred by

the Eleventh Amendment); *Hale v. Arizona*, 993 F.2d 1387, 1398-99 (9th Cir. 1993) (en banc)

(Arizona DOC is an arm of the state not a person for §1983 purposes); *Gilbreath v. Cutter

Biological, Inc.*, 931 F.2d 1320, 1327 (9th Cir. 1991).  Section 1983 claims against states,

therefore, are legally frivolous.  *See Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir. 1989)

(superseded by statute on other grounds as stated in, *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th

Cir. 2000) (en banc)).

       Mr. Powers' claims against DOC, other than his claims under RLUIPA, are not claims

against persons under 42 U.S.C. §1983.  As discussed above, Mr. Powers is not entitled to

injunctive relief against the DOC under RLUIPA.  Therefore, the undersigned recommends that

Plaintiff's §1983 claims against the DOC be dismissed.

*//*

*//*

REPORT AND RECOMMENDATION  - 39

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**H.      Qualified Immunity**

Defendants argue that they are entitled to qualified immunity with respect to Mr. Powers'

claims.  In determining whether qualified immunity applies, the Court may first consider whether

"the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v.*

*Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *modified, Pearson v.*

*Callahan,* 555 U.S. 223, 129 S.Ct. 808, 811, 172 L.Ed.2d 565 (2009) ("while the sequence set

forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory in all

cases").  "If no constitutional right would have been violated were the allegations established,

there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz,* 533

U.S. at 201.

This Court need not address qualified immunity with respect to Mr. Powers' claims

because, as discussed above, he has not established those alleged violations of constitutional

rights.

**CONCLUSION**

Based on the foregoing, the undersigned recommends that Defendants' Motion for

Summary Judgment (ECF No. 26) be **GRANTED;** and that Plaintiff's claims against

Defendants be **dismissed with prejudice, except** Plaintiff's claims regarding the 2010 Eid ul-

Fitr feast, which should be **dismissed without prejudice for failure to exhaust.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the

REPORT AND RECOMMENDATION  - 40

time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **April 19, 2013**, as noted in the caption.

DATED this ___29th___ day of March, 2013.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION  - 41